Okay, Council, whenever you're ready. Good morning. May it please the Court, my name is Rebecca Smith and I represent the Appellants Alliance for the Wild Rockies Native Ecosystems Council and Council on Fish and Wildlife. I would like to reserve five minutes for rebuttal today. Your Honors, we are here today following the denial of a motion for preliminary injunction against the Wood Duck Project on the Helena Lewis and Clark National Forest in Montana. And so today I'll start by explaining why the Alliance has raised serious questions on the merits. I'll then move in to explain why there is a likelihood of irreparable harm. And then finally, I will address why the public interest and balance of equities weighs in the Alliance's favor. First, Your Honor, starting with our first argument on the merits, this was actually an argument that the District Court never got to, it never addressed. And that was the violation of 36 CFR 219.15. That is the NIFMA planning regulation that requires that when you are assessing forest land compliance, you must analyze it in the project approval document. And so I want to start with the plain language of that regulation because that is what the Court has to apply here. And the regulation says, quote, a project or activity approval document must describe how the project or activity is consistent with the applicable plan components. And so we never had that in this case. Neither the project decision notice nor the project EA ever described why the project would be consistent with these applicable forest plan components. When you say that, are you including the description or analysis in the consistency tables? No, Your Honor. So you're saying that the consistency tables were not appropriately incorporated. Is that the argument? Yes, Your Honor. The argument is two part. First, in their brief, the Forest Service did concede that the approval document for the purpose of this regulation is the decision notice. And then, as you say, they then said, but we incorporated a document called the consistency table. And there's two problems with that. First, there is no legal authority for them to incorporate by reference the consistency table. We have the plain language of the NIFMA regulation that says the analysis must be in the approval document itself. We have that specific regulatory language. And then they fail to provide any legal authority for the notion that somehow they could nonetheless put it in any other document. And I want to emphasize, too, that in their brief, they say we incorporated the entire project record into the decision notice. And so by that logic, a member of the public would have to wade through the entire project record, the entire administrative record, to find that analysis. And that's just not what the plain language of the regulation says. It requires that analysis in a specific document which the Forest Service concedes is the decision notice. So the first is a problem of violating the plain language of the regulation. The NIFMA regulation is specific. And then they don't give any legal authority for the notion that they can incorporate by reference. Well, in the NEPA context, I know for a fact we have precedent that says you can incorporate by reference. No longer, Your Honor. That's no longer the case. In 2025, the NEPA CEQ regulations were rescinded. And we did bring this up multiple times in the district court because this was something we talked about in the district court. Well, I'm talking about judicial decisions that say that you can incorporate by reference other documents. And, Your Honor, all of those are based on the CEQ's regulation that says NEPA documents can incorporate by reference. However, within the past year or two, the CEQ has come forward, said that it never had authority to issue those regulations. Is there any Ninth Circuit decision saying that you can no longer incorporate by reference? Your Honor, I don't believe this court has addressed the rescission of the CEQ regulation yet. And what's the timeframe in respect to when the action was taken and the time in which, in your view, it was no longer permissible to incorporate by reference? Thank you, Your Honor. So the Forest Service did make an argument here that the court should still apply incorporation by reference regulation because that regulation was in effect at the time the decision was made. So what's your answer to that? The trick is that the CEQ said that it never had rulemaking authority. So that means that regulation was never valid in the first place. And, Your Honor, I think that when we have two regulations that seem to be in conflict, so even if the court were to apply the rescinded CEQ regulation here, we would then have a specific NIFMA regulation and then a general NEPA regulation. And that is a traditional canon of construction that a general regulatory provision cannot nullify a more specific provision. The specific provision controls. And so the specific NIFMA provision controls over a more generalized generic provision in the CEQ regulations, which, again, has been rescinded and is no longer law. And I think maybe this is why the district court didn't address this. This is a hypothetical question. But if we assume that incorporation by reference were appropriate, I'm not asking you to agree, but if we were to assume, is the analysis contained in the consistency table sufficient? No, Your Honor, and I will walk you through each one of those provisions and why the analysis in the forest land consistency table is not sufficient. So even if incorporated, you still say it's insufficient. That's correct, Your Honor. Our primary argument is regulatory interpretation of the plain language of the regulation does not allow for this. But, yes, even if you did look at this one single document, the consistency table, it's not enough. And so this is in our excerpts of record at 466 through 469. And so regarding the first provision, so there are three elk provisions that are at issue here, the two desired condition and the one guideline. The first desired condition is that ER 466, and that desired condition says that big game species remain on national forest system lands throughout the archery and rifle hunting seasons at levels that support Montana fish, wildlife and parks recommendations regarding big game distribution, population size and harvest. And so then in the column where they profess to demonstrate compliance, they say we have a design feature that applies during the first two weeks of the general rifle season and we will not let workers basically set up use firearms recreationally. That doesn't address where the elk are. This whole provision is are the elk on public lands during the archery and rifle hunting season, which, by the way, is three months long. It runs from September 1st to December 1st. And so saying that they're not going to allow road use during two weeks out of a three-month hunting season, first of all, doesn't address the hunting seasons. But second and more importantly, we're missing the key fact about where the elk are. Are the big game on public lands or not? And the answer is in the record. The answer from the Montana Fish, Wildlife and Parks is in the record, and they said they're not. They said 90 to 95% of elk are already being displaced off of public land during the hunting season. And the reason this matters is because they are named right here in the desired condition. It doesn't just say big game remain on the public lands. It says at levels that support Montana Fish, Wildlife and Parks recommendations. And so Fish, Wildlife and Parks did file a letter and they did make a recommendation and they said you're not meeting this desired condition. But after the plan was amended, FWT did not did not come back in and have a further comment. Am I right? No, your honor. There was no further comment period after that, and they did not file. You said no, but I think you meant I was right. Correct. That is to say, I asked when they came out with an amended plan, did FWP come back in with a comment? I think the answer is they did not. Is that correct? Correct, your honor. And to clarify that there wasn't an amended plan. It was just the final document and it was unchanged. The final decision document lessened the acres of logging and lessened the number of new roads. But Montana Fish, Wildlife and Parks said in order to address these provisions in the forest plan, we need you to close open motorized routes. And that's why they said in their letter that the recommendations that their recommendations that these conditions weren't being met. I may be wrong. I thought that there were two proposed plans. And after the first proposed plan was promulgated, there were there was a comment from FWP and then there was a second proposed plan and there was no comment. Are you saying there was no opportunity for comment after the second plan was put forward? No, your honor. I'm saying there is there. Well, yes, your honor. There is no public comment opportunity after a final decision issued. That's not my question. I understand if there's a final decision, it's a final decision. But my understanding and I may be wrong, is that there was a second plan proposed before issuing the final decision. Am I wrong about that? Your honor, I don't believe that was the case, but I could be wrong about that. But I think what the substance of what you're asking is, did Montana Fish and Wildlife follow up and file another letter and say you're still not complying? Is that sort of what you're asking? And when they had an opportunity to do so? Well, your honor, regardless of whether there was a second public comment period, which I don't think there was, there is an administrative appeal process called an administrative objection, and they did not file an administrative objection to the final decision. The problem here is that we're not using the Montana Fish, Wildlife and Parks to say that they object. They filed an administrative objection to the project. What we're saying is the factual findings about where the elk are, are in that letter. And they say 90 to 95 percent displaced from public land already. And so this table cannot show consistency with the condition when it doesn't even tell us the facts we need to know. And when we look in the record and find those facts, we see that, in fact, big game species are not remaining on national forest land. Is that because, I guess, there's not enough elk security? Yes, your honor. And that is what Montana Fish and Wildlife found, was that the existing high road densities, the lack of elk security is why the elk are being displaced. And I think we laid this out in several tables in our brief, that in some units there's zero percent elk security. And, you know, that's nowhere near the 30 percent elk security, which is the recommendation of Montana Fish, Wildlife and Parks. Elk security within the project area? Yes. Well, your honor, the way they assessed elk security was in, I believe there's five or six elk units. And one unit, I believe, had something like 12 percent security. And then I believe another unit has something like three percent. And then several had no security at all. And so what Montana Fish, Wildlife and Parks said in their letter was the elk are already being displaced because of lack of security. So we want you to pick open motorized routes and close them to increase security. And the Forest Service's response, this is sort of getting back to your point, Judge Fletcher, was that they said, well, this is not a travel management decision. We're not going to change the status of existing open roads. So even though they decided that they would log less and build fewer temporary roads, what they refused to do was close any existing roads. And that's what would have increased elk security. And they refused to do that. Counsel, I don't think. Am I wrong? NYFMA does not require each project to improve elk security. Is that correct? It only requires that it doesn't preclude future attainment of elk security. You're talking about, your honor, the rules on desired conditions. Yes, that's correct, your honor. So whether or not this particular project improves elk condition is irrelevant. Am I right? I'm sorry, your honor. Did you say irrelevant? Irrelevant. Or it would not be a violation of NYFMA if it doesn't improve elk security. Well, no, your honor, because they do have that obligation to demonstrate consistency with the forest plan. And this sort of goes back to what we're arguing is this table we're looking at doesn't give us the facts that we need for a member of the public to know whether they are being consistent with their forest plan, regardless of whether it requires a certain action. The question here is, does this forest land consistency table give us enough factual information to determine whether or not this project is consistent with the forest plan? And our point is, just on this first desired condition, when it says big game species remain on national forest land, that means a critical fact we need to know is where are the big game species? Are they on national forest lands or not? We can't determine whether this condition is met if we're missing that basic fact. And that basic fact is not in this table. And that's one of the multiple reasons why we're saying this table isn't good enough, your honor, to get back to your original question about why this consistency table does not meet their burden to establish forest plan consistency. I would like to address the other parts of this table as well, if I could. You're now eating into your rebuttal time, though. Well, then I'd like to reserve my remaining time for rebuttal. Thank you. Council. Good morning, your honors, and may it please the court. My foster on behalf of the United States. We ask you to affirm the district court's denial of the motion for preliminary injunction in this case for two reasons. First, plaintiffs have failed to show serious questions as to the merits as to both their NIFA and NEPA claims. And second, the plaintiffs failed to show that the court abused its discretion in weighing the equitable factors, namely when determining that plaintiffs delay undermine their showing of irreparable harm and that the balance that plaintiffs failed to show that the balance of the equities and the public interest tip sharply in their favor. Just ask your practical question before we get into some of the legal issues. How far along is the project? How far along is the project now? Sure. So for the Diamond City timber sale, the smaller sale, that was that's an issue on appeal. I believe the entire sale is 204 acres of harvest and 56 have been harvested at this point. So about 26 percent. As for the wood duck timber sale, I believe all the mandatory acres have been harvested at this point. And I gather there's no action taking place now. Correct. Your honor. So the Diamond City timber sale is actually on pause because it is entirely within elk winter range and there's a design feature pausing all harvest during the winter period for that reason. So they, I think, are not supposed to resume until May is what the design feature. Now, you use the word mandatory. You said all of the mandatory has been done. Is there some some other category that's not mandatory that has not been done? Yes, your honor. So tell me about that. Yes. So there is, I think, a section of the contract with Sun Mountain Lumber that deals with timber subject to agreement, which are I think is an options contract. And it's my understanding that there isn't there aren't plans yet to harvest those acres, but they do exist and they are part of it. And how what's the size of that acreage? I want to say it's about 200 acres, but 250 acres. OK, thank you. So I'd like to start with the merits piece, and I'll begin with that procedural issue of 36 CFR 219.15. So that regulation requires that the Forest Service describe how the project is consistent with applicable plan components, which we believe the Forest Service did so here in both the decision notice and in the incorporated consistency table and other parts of the record. So, in the decision notice itself at 2 ER 202. The Forest Service included, excuse me. The Forest Service articulated that. This project was reviewed by an interdisciplinary team of environmental forest health experts. And that in this process, the relevant forest plan components were considered and that implementation would move the project area towards forest plan desired conditions. And now, functionally, we can also see how the how this project moves towards those desired condition and meets those components because appended to the decision notice are all the design features of the project. Now, at the end of that paragraph on that page. The Forest Service then referred to the consistency table, which is incorporated into the decision notice, along with the whole project record explicitly by reference. And that consistency table lists the specific provisions, how they are consistent and what design features are associated with each. We think this certainly fulfills the obligations that the agency has under that regulation. What's your response to your friend's argument that under because the CEQ regs were rescinded, you can no longer incorporate by reference materials. We disagree in our brief. And I think those are NEPA regulations and not necessarily NEPA regulations. I am not clear as to whether I have not seen any regulations that say that you cannot incorporate by reference in a consistency or sorry, in a decision notice. And also, it sort of makes sense that you can hear. You know, the agency is tasked with balancing how much information they put in each individual document. And I think what's really helpful here is that the agency did so in a way that is quite organized, helps you find the answers that you seek. If you're a member of the public, you know, point to the consistency table, but doesn't have to have an extremely long decision notice. And is NIFMA subject to harmless error review? Yes, Your Honor. So, you know, if even if it was slightly error, obviously, we could see what the rationale was. Yes, Your Honor. And so moving on to the substantive portion of the NIFMA claim, we believe that the Forest Service reasonably determined and reasonably explained how this project was consistent with forest plan components in several locations in the record, which at this stage in the inquiry, we can look everywhere in the record. So not only well, and actually, I'll start just by first touching upon that the three components that issue here are not standards. So the Forest Service must determine that they are that the plan is the project is consistent with those three provisions. But what those three provisions require is a lot less than the mandatory constraints required by standards. So for desired conditions, I think Judge Bumate said earlier, the project must not preclude achievement or maintenance of those desired conditions in the long term. And for guidelines, it's even more flexible, allowing for a departure from their terms as long as their purpose is met. So where does the agency address the condition in that language? Yes, Your Honor. So in that language, I would say the consistency table. It's specific. Right. I actually think there are a few other places in the record. You can look to the elk report, which lists the different design features. And then I think appends the specific component that each design feature relates to. There's also let me see. Yeah, I think that those are the two main areas where I think it's the most clear. And then, of course, the analysis throughout the environmental assessment and makes clear that the Forest Service is looking at those variables. This project will not preclude attainment of sufficient security area within, I guess, the particular elk land that's where the project is located. Yes. And it's true that elk security is very low in this area. I think part of the reason for that is the recent wildfires that destroyed a lot of the project area. And that's kind of what prompted this project in the first place was maintenance of those areas, specifically in the fire perimeter to help build resiliency to insects, to an ongoing insect problem within those trees with pretty high density levels. I'm somewhat confused. Was this prompted as a commercial project? And, you know, or and then that's a side benefit or was this that the primary reason and the commercial side was just a way of achieving it? It's my understanding that it's both. I mean, there are three three purposes listed and one of them is specifically commercial. Timber harvest is a really important part of the economy in that area. And I'm but I also think that there's, you know, the Forest Service is balancing also the need to make sure that these trees are not going to be destroyed by insect problems in the future as well. So and it's a really it's a relatively small project, too. It's about one thousand two hundred acres and the project area itself is about seventy thousand acres. And I actually thought that on the elk security point, one thing that was really interesting is just looking at the maps in the E.A. of elk security. You can really see where elk security is, which is kind of in the center of the project area. And all of the work that's being done, all the harvest and the road work are on the edges. They're not close to that elk security, which is why the Forest Service found ultimately that this project has no direct effects on elk security. Now, how about guideline one? Sure. And the roads. So guideline one, the Forest Service found that it that the intent was met, but they also noticed noted that there is a there's language at the beginning of that guideline that says that prior to management actions that would increase or change the location, timing, mileage or density of wheeled motorized routes open during the archery and rifle hunting seasons. This project doesn't have doesn't increase or change the location, timing, mileage or routes of wheeled motorized routes open during those seasons. This only has temporary roads. So in the first place, the Forest Service, it's a Forest Service position that this guideline doesn't apply. But the Forest Service still went on to include design features that minimize the effects of temporary roads as well in good faith after comment periods in which roads were brought up as an issue. So the Montana, well, I thought the Montana wildlife, what's it called? Fish, wildlife and parks, fish, wildlife and parks that they express. So they express concern that the that the roads. That they they need to be cut. Well, they advocate or recommended that there be a reduction in the roads. They did. And that's because elk. I guess shy away from motorized vehicles. Right. Yes, that's true. That keeps the elk out of the public lands. Yes, it does. And our response to those comments in particular, there are a few a few points. First, is that. You know, those comments highlight what's wrong with the existing conditions in the area and this project. Is not meant to or does not have to under the terms of the desired conditions and guidelines necessarily improve elk security. But it's not to preclude attainment of elk security throughout the late. I forget what they're called elk elk analysis units. Yes. Analysis units. Yes, of course. Yes. And I would argue that by not impacting elk security at all, it's not. It's not precluding attainment of that desired condition in the long term. And I think that's really important in the long term part of the what is required for desired conditions. That those comments also came very early on in the project when the project was, I think, at that point, about 3000 acres of harvesting. It's now been cut by more than half and the number of roads have been reduced in response to the comments received over the course of the project timeline. And so insofar as. And so it was reasonable for the Forest Service to afford those comments less weight further on, especially because FWP did not object later on in the process. Was there a little bit unclear? Was there an opportunity to comment further? Yes. So that would be the objection period, which was referred to earlier. So during the objective during the objection period, anyone who had previously commented on the project during the first comment period could then file an objection to say, you know, we still disagree with X, Y and Z. That is to say, in response to the questions I asked to your friend on the other side, when the revised plan came forward, there was a comment period after that was put forward. Yes, I think in the record it describes it as an objection period. So I don't want to conflate the two if there is a significant difference. There was a time in which people could say or entities could say something in response. Yes, Your Honor. Whether it's called comment or objection. Yes, Your Honor. And at that point, FWP says nothing. Correct, Your Honor. I just have another question. The briefing between the government and Sun Mountain is slightly different. I just was curious. Do you disagree with anything that Sun Mountain argues or says? I don't believe so, Your Honor, but I'm not particularly sure what those discrepancies are. The one I recall is the East Side assessment. I think the government suggests that you did comply with it. And then I think Sun Mountain says, well, it doesn't even apply because it doesn't change the open roads or something like that. It doesn't apply. Yes. So I think that sounds like they're looking at it through the lens of the guideline of Guideline 1, which, as I was mentioning earlier, has that express. It applies only when there are open roads. And I think you argued that you did comply, so it doesn't. Yeah, our argument is we didn't need to, but we did. And there are several points in the record in which we refer to the East Side assessment in particular types of analyses. I think it comes up in the response to comments. And so we do think that we took them into consideration. Now, Your Honors, with my limited time, I would like to ask if you have any questions about the equities piece. Well, I guess I did have one question. If they didn't object to the Diamond 1, you know, for the injunction, doesn't that make it inconsistent to say that there's such harm on the other project? Sorry, Your Honor, could you repeat that? Didn't it on, I recall in the, for the injunction, they didn't want to stop one project, right? And they only wanted, there's three projects and they only wanted to stop one. There's technically two projects. One is the Wood Duck Timber Sale. One is the Diamond City Timber Sale. I think by the time the injunction, the motion had been filed, there had already been work done on the Wood Duck Timber Sale. And so on appeal, they have relinquished those claims. Let me ask you this. Did the district court adequately consider the harm to the plaintiffs? I mean, there's a lot of discussion about the logging companies and, you know, all that. Yeah. Was there really a balance? I think that there was, Your Honor. I think that the, um, the language that the district court used specifically was that what timber sale or timber, what was it? Timber harvesting or timber cutting is not inherently damage to forests. Interoperable harm does not automatically arise from all environmental impacts caused by logging. It sounded like to me that the district court was weighing those, uh, the immediate environmental harms of potential environmental harms of cutting down the trees. But with the future environmental harms, sorry, future environmental benefits of the project, along with the economic harms to the, excuse me, to the, to the timber companies. I also just want to note very quickly, something was misstated in our brief. I think I said that there was no finding of economic harm below, um, or no, nothing in the record about economic harm to the Diamond City Timber Sale. But there is in the Sorenson Declaration, which discussed the number of jobs that would be impacted by each sale. And in that case, it was 13. I see I'm over time. May I briefly conclude? Yeah. Thank you, counsel. Thank you. Good morning, your honors. My name is Chris McLean. I represent Sun Mountain Lumber Company. And I want to try to correct what may be a little bit of a misunderstanding right off the bat and that there were not 3 projects. What we have here is the large project that 70,000 acres that the Forest Service was analyzing under NIFMA and NEPA. That's the Wood Duck Project. And then underneath that, you have the timber sale that Sun Mountain, my client, was working on, the Wood Duck Timber Sale. And they accomplished most of that. They got all the required timber off. They still have some optional timber that they can take. But right now, the market conditions, they just can't do it. It's too expensive. And then you have the Diamond City Timber Sale that is mentioned in the briefs, and that's about 25 percent done. Government counsel correctly stated that. And that's being operated by a different outfit that is not going to be sending that timber to my client, Sun Mountain Lumber's mill in Deer Lodge, Montana. We join, Sun Mountain joins the government, most of their arguments. And my intention right now is to take my five minutes to talk about how the district court properly determined that the Forest Service took the required NEPA hard look at the project and in approving it. Again, let me ask you this. I gather what you're saying with respect to the work that's been accomplished. Are you in any way suggesting that the need for an injunction is moot? No, no, Your Honor. And one of the things that we talked about is maybe the court will inquire, you know, McLean, why is Sun Mountain standing here if you've already got all your all your required timber off? But, of course, there's the optional timber that they would like to get someday. But as I indicated, this project is 70,000 acres and there's we anticipate there will be additional timber sales in the future. I see. Not just these two that are ongoing. And our client is desperate to bid on timber. So they're anticipating that they'll be able to bid on timber in the future from the Wood Duck Project and bring those jobs. Even with the market conditions, as you just alluded to, they're hoping it's a hope, right? It's hope because right now they're in a very, very dark spot there. They have no timber for their mill. They're scrambling right now to get the timber they need because Sun Mountain obtains most of its timber, not all of it from public lands. And so they depend on the Forest Service sales to keep this mill in Deer Lodge, Montana, running and employs 120 people. They also have another one in Livingston, Montana, that employs 65 people. And so the equities here, as we've talked about a little bit, really are very, very important to these two communities in Montana. These mills are very on the very edge of running out of timber, not being able to operate. And these every single sale is critical to their continued existence. And that's why we're standing here talking about these sorts of things. So I wanted to I wanted to make that that was clear to the court as well. So we're anticipating being able to bid on some timber sales in this Wood Duck Project. And that's why we're here arguing against in support of the district court's denial of preliminary injunction. The district court properly found that the administrative record demonstrates the Forest Service thoroughly considered the effect of road construction on elk security. And there's a long list in our brief of the factors that the Forest Service listed in the administrative record. And the district court actually referenced as well about how the Forest Service considered the effect of road building. The Forest Service considered the causes of elk migration to private land during the hunting season. There's a long discussion of that at 3ER348. The Forest Service evaluated the long term effects of road construction on habitat effectiveness, 3ER338-339. The Forest Service weighted the relatively small treatment area against the large range of home range of the elk in the area. They're just impacting a small portion of this area. That's at 3ER349. The Forest Service selected treatment areas that overlap with only a small portion of each elk hunting unit. That's in the record at 3ER349. The Project EA and Decision Notice and FONSI both state that the project is consistent with revised forest plan provisions. That's in 2ER195, 2ER202-203, 3ER266. And then we have the Project Elk Report and the Consistency Table that are referenced and incorporated by reference. And this court has determined numerous times that that's completely legally appropriate. Most recently, I put the court to its decisions in Cascadia that that was brought up. And this court said, yeah, the Forest Service can incorporate these things by reference. Additionally, all temporary roads constructed on the project will be closed to the public. Appellants overstate the content affecting significance of Montana's FWP 2022 comment letter. The District Court correctly noted that Montana FWP's comments were made when the proposed project treatment area and road construction were significantly larger. It was 2,977 acres when Montana commented, and it was taken down to 1,241 acres after it was ultimately analyzed under the 2024 plan. You're now over time if you want to start wrapping up. I will certainly do that. Thank you very much, Your Honor. The District Court noted Montana FWP's comments contain, these comments, this letter, contain no analysis and simply express a belief based on an estimate of secure habitat in the project area. And that's also cited in our brief at particular spots in the record. For these reasons and everything argued by the government, Your Honors, my client, Son Mountain Long, I log in respect for the request. This court affirmed the District Court's denial of appellant plaintiff's motion for a preliminary injunction. Thank you very much for your time this morning. Can I ask you just one other sort of record question?  Do you know what the status of the litigation is in the District Court? We are pausing, awaiting this decision. In this? Yes. Okay. And the Forest Service has not posted any further sale opportunities. That's true. Okay. Thank you. Thank you, Your Honors. I'd like to address a few points on rebuttal. First, you know, the standard for this court to apply when we look at the way an agency interprets a regulation, including a forest plan provision, is set forth by the U.S. Supreme Court in Kaiser v. Wilkie. And so in that decision, the Supreme Court said we no longer have reflexive deference to the way that an agency looks at a regulation. Instead, the court must look at the plain language of that regulation. And so that's where I'd like to start on rebuttal is the plain language of the regulation that is the 36 CFR 219.15. Again, that plain language says a project or activity approval document must describe how the project or activity is consistent with the applicable plan components. So first, you would need to have them tell you what the applicable plan components are. Next, they would have to describe how the project is consistent with those plan components. And third, that would need to be in the project approval document. Under Kaiser v. Wilkie, this court cannot adopt an interpretation of this regulation that is contrary to that plain language. But that is what the Forest Service is asking you here to do today. They're asking you to find a footnote to this plain language that says unless you just want to incorporate by reference the entire administrative record. This language does not admit of any exception. It simply incorporates the consistency table and says if you see this consistency table, if you want to see more. The decision notice does that, Your Honor. I'm talking about 36 CFR 219.15. That does not allow incorporation by record. To add an allowance for incorporation by record into that regulation would be to violate the omitted case canon. That would be to insert a word or words into the regulation that is not in there. And that is impermissible under Kaiser v. Wilkie. This court cannot throw aside the plain language of a regulation. And I want to point out that. Let me ask you this practically speaking. So what are you asking to have done or to happen? Only what's in the regulation, Your Honor. Well, explain that to me. Okay. So the project decision document. The lawyer's answer. Explain it to me. What do you want done? What do you want to happen? Your Honor, we want the decision or the project approval document to say, here are the applicable forest plan components for this project. And here are how we are complying with them. So they would say desired condition. Big game habitat must remain on the forest. Here's how we're complying. Desired condition four. We're balancing motorized access with elk security. Here's how we're complying. Guideline one. Here's how we're complying. So instead of saying C4's plan consistency table available on the project website, they just have to put that table in the notice decision. Almost, Your Honor, if the table actually met their burden here. But the procedural argument would be gone if they just move that two pages of the table into the decision. Yes, Your Honor. Instead of see the table. And that's not a big ask because they could do that. The problem. They need more explanation. Yes, Your Honor. And that's tied to the NEPA hard look. But I just want to emphasize again that this is a specific regulation that requires a specific thing. And the Forest Service hasn't come. How is it not almost error then? Because, Your Honor, because this is such a huge issue of public interest to the public. In Montana, big game hunting. If it's such a huge interest, then if they wanted to see the consistency table, they could go to the website and see it. But that is not what NIFMA demands, Your Honor. And you're asking why does this matter. And I'm telling you that the revised forest plan went through a multiyear process. And over and over again, the public said, how are you going to protect elk habitat? And the Forest Service said, we promise, even though we're not putting standards in the forest plan, here's a desired condition, here's another, here's a guideline. We promise we're going to apply these things to keep elk habitat on public land and to manage security at appropriate levels. And they're not doing that. What is the public interest? Is it for hunting purposes? They want to hunt to help? Yes, Your Honor. And that's set forth in the Eastside Assessment, which is the document that the forest plan expressly incorporates in Guideline 1. Most environmental cases are trying to protect the animals here. They just want to hunt them. It's wonderful, right? Well, Your Honor, if we look at the Eastside Assessment, when it talks about public interest, it does say hunting. It also acknowledges that by maintaining elk habitat, by reducing roads, you are helping other kinds of wildlife populations. And I see that my time is up. Thank you. Thank you, counsel. Okay. This case is submitted, and we are adjourned for today. Thank you. All rise. Hear ye, hear ye. All persons present have business to be honored. The United States Court of Appeals for the Ninth Circuit will now depart. For this court, the discussion now stands adjourned.
judges: FLETCHER, PAEZ, BUMATAY